**ORIGINAL**

**JANET LEE HOFFMAN, OSB #78114**
**Law Offices of Janet Lee Hoffman**
1000 S.W. Broadway, Suite 1500
Portland, OR 97205
Telephone: (503) 222-1125
Facsimile: (503) 222-7589
E-mail: janet@jhoffman.com

FILED '05 JAN 19 14:00 USDC-ORP

**DEAN D. DECHAINE, OSB # 64025**
**Miller Nash LLP**
111 S.W. Fifth Avenue
Portland, Oregon 97204
Telephone: (503) 224-5858
Direct Fax: (503) 205-8641
E-mail: dean.dechaine@millernash.com

Attorneys for Defendant
**PACIFIC & ATLANTIC CORPORATION**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | CR No. _05-07 HH_ |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **PETITION TO ENTER PLEA** |
| **vs.** | ) | **OF GUILTY, CERTIFICATE** |
| | ) | **OF COUNSEL, AND ORDER** |
| **PACIFIC & ATLANTIC CORPORATION,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

The defendant represents to the Court:

1.      My name is Konstantinos G. Gerapetritis. I am duly authorized by power of attorney to enter a plea of guilty on behalf of Pacific & Atlantic Corporation ("Pacific & Atlantic").

2.      Pacific & Atlantic's attorneys are Janet Lee Hoffman and Dean D. DeChaine.

**PAGE 1 – PETITION TO ENTER PLA OF GUILTY**

3.      The attorneys for Pacific & Atlantic and I have discussed the case fully.  I have received a copy of the Indictment.  I have read the Indictment, and I have discussed it with the attorneys for Pacific & Atlantic.  The attorneys have counseled and advised me concerning the nature of each charge, any lesser-included offense(s), and the possible defenses that Pacific & Atlantic might have in this case.  I have been advised and understand that the elements of the charge- alleged against Pacific & Atlantic to which it is pleading "GUILTY" are set out in Paragraph 3. of the Plea Agreement.  I have had a full and adequate opportunity to disclose to the attorneys for Pacific & Atlantic all facts known to me that relate to the case.

4.      I know that if Pacific & Atlantic pleads "GUILTY," I will have to answer any questions that the judge asks me about the offense to which Pacific & Atlantic is pleading guilty.  I also know that if I answer falsely, under oath, and in the presence of Pacific & Atlantic's attorneys, my answers could be used against me in a prosecution for perjury or false statement.

5.      I am not under the influence of alcohol or drugs.  I am not suffering from any injury, illness or disability affecting my thinking or my ability to reason.  I have not taken any drugs or medications within the past seven (7) days.

6.      I know that Pacific & Atlantic may plead "NOT GUILTY" to any crime charged against it.  I know that if Pacific & Atlantic pleads "NOT GUILTY" the Constitution guarantees it:

        a.      The right to a speedy and public trial by jury, during which Pacific & Atlantic will be presumed to be innocent unless and until it is proven guilty by the government beyond a reasonable doubt and by the unanimous vote of twelve jurors;

        b.      The right to have the assistance of an attorney at all stages of the proceedings;

**PAGE 2 – PETITION TO ENTER PLA OF GUILTY**

c.      The right to use the power and process of the court to compel the production of evidence, including the attendance of witnesses in my favor;

d.      The right to see, hear, confront, and cross-examine all witnesses called to testify against it;

e.      The right to decide for itself whether to have a corporate representative  on behalf of the corporation take the witness stand and testify, and if Pacific & Atlantic decides not to take the witness stand, I understand that no inference of guilt may be drawn from this decision; and

f.      I understand the corporate representatives have a personal right not to incriminate themselves at any trial.

7.      I know that if Pacific & Atlantic pleads "GUILTY" there will be no trial before either a judge or a jury.

8.      In this case, Pacific & Atlantic is pleading "GUILTY" under Rule 11(c)(1)(B).  Its attorneys have explained the effect of this plea under Rule 11(c)(1)(B) to be as follows]:  The prosecutor is recommending a sentence, however, sentencing is solely within the discretion of the Court.  *See* Plea Agreement for terms of their offer.

9.      I know the maximum sentence which can be imposed upon Pacific & Atlantic for the crime to which it is pleading guilty is a fine of $500,000.

10.     I know that the judge, in addition to any other penalty, will order a special assessment as provided by law in the amount of $400.

11.     I know that if Pacific & Atlantic is ordered to pay a fine, and willfully refuses to pay that fine, or violates any other condition imposed by the Court, it can be returned to Court, for a probation violation hearing.  In the event of a probation violation, the Court has the authority to increase the fine and enter other restrictions on the corporation up to appointing a receivership.

**PAGE 3 – PETITION TO ENTER PLA OF GUILTY**

12.     Pacific & Atlantic's plea of "GUILTY" is based on a Plea Agreement that Pacific & Atlantic has made with the prosecutor.  That Plea Agreement is attached hereto and incorporated herein.  I have read the Plea Agreement, and I understand the Plea Agreement.

13.     The Plea Agreement contains the only agreement between the United States government and Pacific & Atlantic.  No officer or agent of any branch of government (federal, state or local), or anyone else, has promised or suggested that Pacific & Atlantic will receive any other form of leniency if Pacific & Atlantic pleads "GUILTY" except as stated in the Plea Agreement and through the agreement made with the U.S. Coast Guard not to impose additional fines or penalties.  I understand that Pacific & Atlantic cannot rely on any promise or suggestion made to it by a government agent or officer which is not stated in writing in the Plea Agreement, or which is not presented to the judge in its appearance in open court at the time of the entry of its plea of guilty.

14.     Pacific & Atlantic's plea of "GUILTY" is not the result of force, threat, or intimidation.

15.     Pacific & Atlantic hereby requests that the judge accept its plea of "GUILTY" to the count 2 of the indictment.

16.     I know that the judge must be satisfied that a crime occurred and that Pacific & Atlantic committed that crime before its plea of "GUILTY" can be accepted.  With respect to the charge to which Pacific & Atlantic is pleading guilty, it represents the following facts are true:

On January 3, 2005, in Portland, Oregon, in the District of Oregon, Pacific & Atlantic Corporation, by and through its agents or employees, whose actions were within the scope of the duties of its agents and employees knowingly failed to accurately maintain the Oil Record Book.  Specifically, the Oil Record Book did not accurately reflect all disposals of oil residue and all overboard discharge of bilge water, as required by law.

**PAGE 4 – PETITION TO ENTER PLA OF GUILTY**

17.    Pacific & Atlantic's offer to a plea of "GUILTY" is made freely and voluntarily and of its own accord and with a full understanding of the allegations set forth in the Indictment, and with a full understanding of the statements set forth in this Petition and in the Certificate of Pacific & Atlantic's attorneys that is attached to this Petition.

SIGNED in the presence of Pacific & Atlantic's attorneys, after reading all of the foregoing pages and paragraphs of this Petition on this 19th day of January, 2005.

PACIFIC & ATLANTIC CORPORATION,

By:_____
KONSTANTINOS G. GERAPETRITIS

**PAGE 5 – PETITION TO ENTER PLA OF GUILTY**

## CERTIFICATE OF COUNSEL

The undersigned, as attorney for defendant Pacific & Atlantic Corporation, hereby certifies:

1.      I have fully explained to the defendant the allegations contained in the Indictment or Information in this case, any lesser-included offense(s), and the possible defenses which may apply in this case.

2.      I have personally examined the attached Petition To Enter Plea of Guilty And Order Entering Plea, explained all its provisions to the defendant, and discussed fully with the defendant all matters described and referred to in the Petition.

3.      I have explained to the defendant the maximum penalty and other consequences of entering a plea of guilty described in the Petition.  I have also explained the consequences of a violation of probation.

4.      I recommend that the Court accept Pacific & Atlantic Corporation's plea of "GUILTY."  SIGNED by me in the presence of the above-named defendant, and after full discussion with the defendant of the contents of the Petition To Enter Plea of Guilty, and any Plea Agreement, on this 19th day of January, 2005.

_____
JANET LEE HOFFMAN

## ORDER ENTERING PLEA

I find that Pacific & Atlantic Corporation's plea of GUILTY has been made freely and voluntarily and not out of ignorance, fear, inadvertence, or coercion. I further find this defendant has admitted facts that prove the necessary elements of the crime to which the defendant has pled guilty.

IT IS THEREFORE ORDERED that the defendant's plea of GUILTY be accepted and entered as requested in this Petition and as recommended in the Certificate of defendant's attorney.

DATED this __19__ of January, 2005, in open court.

_____
JUDGE, UNITED STATES DISTRICT COURT

**ORDER ENTERING PLEA**

## PACIFIC & ATLANTIC CORPORATION

Written Resolutions of all the Directors of PACIFIC & ATLANTIC CORPORATION ("the Company") pursuant to the Articles of Association of the Company.

IT IS HEREBY UNANIMOUSLY RESOLVED as follows:

1. THAT   the Company does give a Power of Attorney to Konstantinos G. Gerapetritis of Athens, Greece, appointing him the attorney-in-fact of the Company, with power to act in respect of all matters and on the terms described in the Power of Attorney attached and marked "A".

2. THAT   the Company, by and through Konstantinos G. Gerapetritis, is authorized to plead guilty to the felony charges arising out of the alleged wrongful entries in the Oil Record book of Royno Shipping Company Limited's flag ship "JOHN G. LEMOS," that the Company will enter into and comply with all the provisions of the Plea Agreement; that the President of the Company and his designees are authorized to take the actions called for in the Plea Agreement; and that all formalities, including, but not limited to, approval by the Company's directors, required for such authorization, have been observed.

3. THAT   any one of the Directors of the Company be authorized to execute and sign the said Power of Attorney on behalf of the Company and affix the Seal of the Company thereon.

Dated this 19th day of January 2005.

**Panagiotis Petromanolakis**                    **Loukas Tsoumakides**

Directors

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS that **PACIFIC & ATLANTIC CORPORATION**, a company incorporated under and pursuant to the Laws of Liberia (hereinafter called "the Grantor") with its Registered Office at 80, Broad Street Monrovia Liberia, does hereby make, constitute and appoint Mr. Konstantinos G. Gerapetritis of Athens, Greece, its true and lawful Attorney (hereinafter called "the Attorney") for it and in its name, place and stead and on its behalf to do all or any of the following acts, matters, deeds and things, namely:

1. To appear before any court, governmental body or other appropriate authority in the United States of America in connection with the potential indictment of the Grantor for the alleged wrongful entries in the oil record book of Royno Shipping Company Limited's Cyprus flag vessel "John G. Lemos," and, if necessary, to plead guilty to such charge in the United States Court for the District of Oregon.

2. To negotiate and agree and to sign any settlement agreement, including a non-prosecution agreement, with the United States Attorney or other appropriate United States authorities in respect of the aforesaid charge.

3. To negotiate and agree and to sign any environmental management system/compliance program agreement.

4. To sign any documents and to take any and all further steps which the Attorney may in his sole and absolute discretion deem to be necessary or desirable to accomplish the purposes herein specified with full power of substitution, the Grantor hereby ratifying and confirming all that the Attorney or any substitute appointed by him shall lawfully do or cause to be done by virtue hereof and undertaking to indemnify the Attorney or any substitute appointed by him against

all claims, costs, expenses and liabilities of any nature or description whatsoever arising from the exercise in good faith of any of the powers conferred by this Power of Attorney.

IN WITNESS WHEREOF the Grantor has caused these presents to be duly executed under the Common Seal of the Grantor this 19th day of January 2005.

The Common Seal of **PACIFIC &**         )

**ATLANTIC CORPORATION** was    )

hereunto Affixed in the presence of:       )

**Panagiotis Petromanolakis
Director**

UNITED STATES DISTRICT COURTDISTRICT OF OREGON

**UNITED STATES OF AMERICA**                    Case No. _____

                Plaintiff,

                                **PLEA AGREEMENT 33 U.S.C. § 1908(a)**

      v.

**PACIFIC & ATLANTIC CORPORATION,**

                Defendant.

        The United States of America, by Karin J. Immergut, through Assistant United States Attorney Dwight C. Holton enters into the following plea agreement with defendant PACIFIC & ATLANTIC CORPORATION ("Pacific & Atlantic") (also the "defendant"), by and through Mr. Konstantinos G. Gerapetritis of Athens, Greece, its true and lawful attorney, and approved by its Oregon attorneys Janet Lee Hoffman and Dean D. DeChaine, hereby enter into the following Agreement, pursuant to Federal Rule of Criminal Procedure 11.

        1.     **Introduction**:  In recognition of the defendant's cooperation with this investigation, including its efforts to obtain truthful statements from the officers and crew members on the vessel, its agreement not to take adverse action against those officers and crew members who testified truthfully, and its efforts to resolve this matter promptly, the United States joins the defendant in entering the following agreement:

        2.     **The Charges**: Pacific & Atlantic, by and through the actions of the M/V JOHN G. LEMOS's crew members, knowingly failed to maintain an Oil Record

Page 1 -  Plea Agreement – 33 USC § 1908(a)

PDXDOCS:1445289.3

Book in which all disposals of oil residue and all overboard discharges and disposals of bilge water were fully recorded, in violation of Title 33, United States Code, Section 1908(a) and Title 33, Code of Federal Regulations, Sections 151.25(a), (d) and (h).

3.    **Elements of the Offenses**:  The government must prove that the defendant Pacific & Atlantic, by and through the actions of its agents and/or employees, who were acting within the scope of their employment, knowingly failed to maintain an Oil Record Book in which all disposals of oil residue and all overboard discharges and disposals of bilge water were fully recorded.

4.    **Penalties**:  Violation of 33 U.S.C. § 1908(a) is a felony and the maximum fine for corporations is $500,000 or twice the gross pecuniary gain derived from the crimes or twice the pecuniary loss caused to the victims of the crime, whichever is greater.  18 USC § 3571(c)(3), (d).  The sentence may include a term of probation of at least one year but not more than five years.  There is a $400 mandatory special assessment.

5.    **Sentencing Agreement**:  Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), the United States and Pacific & Atlantic will recommend that the court impose the following sentence:

A.    Fine.   Pacific & Atlantic shall pay a fine in the total amount of $500,000.

B.    Probation.  Pacific & Atlantic will be placed on organizational probation for a period of four (4) years pursuant to USSG §§ 8D1.1 and 8D1.2.  The terms of the probation shall be:

(1)    No Further Violations.  Pacific & Atlantic agrees that it shall commit no further violations of federal, state or local

Page 2 -  Plea Agreement – 33 USC § 1908(a)

law, including those laws and regulations for which primary enforcement has been delegated to state authorities and shall conduct all its operations in accordance with the MARPOL Protocol.

(2)     Environmental Management System/Compliance Plan.  Consistent with the sentencing policies set forth in USSG § 8D1.4, Pacific & Atlantic agrees to develop, adopt, implement and fund the Environmental Management System/Compliance Plan ("EMS") attached hereto as Exhibit A.  Pacific & Atlantic, at its option, may develop its own EMS plan within 90 days of the date hereof and, if acceptable to the Government, will replace Exhibit A.  The government retains the sole discretion whether to accept a substitute EMS.

> (a)     The EMS will establish that: all environmental and related operational risks have been identified; such risks are being appropriately managed and potential risks are being avoided; all international, federal, state and local laws, regulations, and environmental permit requirements are being adhered to; appropriate policies, programs, and procedures are in place; organizational responsibilities are clearly defined, understood and implemented; environmental quality control assurance and verification systems are in place, as determined by appropriate self-policing and third-party audits; company operations, including contractor operations and on-site service provider operations, do not present actual risks to the

environment.  Pacific & Atlantic shall ensure that the environmental compliance program is diligently enforced by its officers and managers.

(b)     Pacific & Atlantic shall be responsible for all costs associated with the development, implementation, maintenance and monitoring of the EMS.  Pacific & Atlantic agrees that during the period of probation, and at all reasonable times and with as reasonable prior notice by the United States as practicable, it will provide the United States with access to its vessels listed in the EMS, as well as all facilities, employees, and records that are relevant to monitoring compliance with the terms and conditions of the EMS.

(c)     If Pacific & Atlantic changes its name, the renamed company shall be obliged to meet all of the obligations of Pacific & Atlantic under this agreement. If Pacific & Atlantic merges with another company through a stock or asset purchase, the newly created or merged company shall be obliged to meet all of the obligations of Pacific & Atlantic under this agreement with regard to those vessels subject to the EMS and managed by Pacific & Atlantic at the date of the merger.

Page 4 -  Plea Agreement – 33 USC § 1908(a)

(d)     The parties recognize that during the term of probation, the number and identity of vessels managed by Pacific & Atlantic that call in the United States may increase or decrease.  Any vessel removed from management by Pacific & Atlantic or which stops calling in the United States shall be excluded from the scope of its EMS.

(3)     Pacific & Atlantic agrees that it will not take any adverse action against the officers and crew members who testified before the Grand Jury for their participation in the events leading to this investigation and prosecution or for their role in testifying before the Grand Jury.  Prohibited adverse actions include, but are not limited to, dismissal from service and negative performance review.

C.     **Community Service**.  As noted above, the parties agree that the defendant shall pay a total fine amount of $500,000.  The United States will petition the Court at  the time of sentencing to order  Pacific & Atlantic to pay one-half of the total fine amount, $250,000,  in community service  pursuant to USSG § 8B1.3 and in furtherance of the sentencing principles provided in 18 U.S.C. § 3553(a), for the purpose of funding one or more projects for the benefit, preservation, and restoration of the environment and ecosystems in the waters of the United States.  Pacific & Atlantic shall support the government's petition regarding community service.

(1)     The United States will petition the court to have Pacific & Atlantic deposit the Community Service funds into the Columbia River Estuarian Coastal Fund, created for the purpose of using the money from the settlement of ocean pollution cases.  The Fund is administered by the National Fish & Wildlife Foundation. The Foundation has entered into an agreement with the U.S. Fish & Wildlife Service of the Department of Interior. The Service and the Foundation are to form an advisory

group, comprised of the Foundation, the Service and several other representatives who will likely be selected from local governments.

(2)     The advisory group will receive proposals for the use of the money in environmental projects on the lower Columbia River and adjacent coasts, and make selections and recommendations to the Service, which must approve the projects.  Any approved project will also be subject to review by the Congressional representative of the area in which the project would take place.   Under the agreement, the Fund must submit an annual report to the government and to the court, including audited financial statements, of the disposition of the money in the fund.

6.     **Application of the Agreement**:  This agreement shall bind Pacific & Atlantic and such other companies as may be included in paragraph 5, above, or the attached Exhibit A.  Pacific & Atlantic shall provide the District of Oregon and the United States Probation Office with immediate notice of any name change, business reorganization, sale or divestiture impacting its ability to pay the fine or affecting this Agreement and the EMS.  Pacific & Atlantic shall not engage in any action to seek to avoid the obligations and conditions set forth in this Agreement.

7.     **Statement of Facts**:  The parties agree that the United States would offer the following facts to support the plea.

A.     Pacific & Atlantic is a corporation organized in Liberia, with its registered office in Monrovia, Liberia, with its principal office in Greece. Among other things, Pacific & Atlantic is the ship manager of 10 ocean-going ships, primarily bulk carriers.

B.     One of the ships for which the defendant acts as the ship manager is the motor vessel ("M/V") JOHN G. LEMOS, weighing 11,031 gross tons,

Page 6 -   Plea Agreement – 33 USC § 1908(a)

owned by Royno Shipping Company Limited. The M/V JOHN G. LEMOS sails under the flag of Cyprus.

C. The M/V JOHN G. LEMOS typically operates with a crew of approximately twenty-two. Approximately eight crew members of different rank work in the ship's engine room, including a chief engineer, a second engineer, a third engineer, a fourth engineer, an electrician, a fitter, and two oilers. During the period relevant to this Plea Agreement, the Chief Engineer was primarily responsible for properly disposing of waste oil that accumulated onboard the vessel and was responsible for operating the vessel's Oil Water Separator ("OWS") and incinerator. The Chief Engineer had overall responsibility for engine room operations. The Chief Engineer reported directly to the captain, who was responsible for all vessel operations.

D. Large ocean going vessels, like the M/V JOHN G. LEMOS, produce waste oil and bilge water as a result of the operation of machinery in the engine room. Some of the waste oil, together with water and other liquids, accumulates in the bottom or "bilges" of the vessel. The bilge waste is collected and run through various processes designed to separate the oil and other wastes from the water. These processes include settling tanks and the OWS. After processing by the OWS, bilge water containing very small amounts of oil may be legally discharged overboard. The OWS has an oil content meter to measure the amount of oil in its discharges. If the amount exceeds 15 parts per million, the OWS diverts the discharge into holding tanks on board. Oil removed from the bilge waste, along with other waste oils from the ship, are stored in a sludge tank. Some ships, such as the M/V JOHN G. LEMOS, burn the sludge on board in an incinerator. Oil-contaminated bilge waste and other waste oils, including sludge, may also be off-loaded while the vessel is in port, and by properly disposing onshore.

E. Under the MARPOL Protocol, an international treaty implemented in the United States by the "Act to Prevent Pollution from Ships" ("APPS"), 33 U.S.C. 1901, et seq., a ship may not discharge overboard water with more than

fifteen (15) parts per million ("ppm") of oil.  The MARPOL Protocol and the APPS require that each oil tanker of 150 gross tons or more, or non-tanker vessels of more than 400 gross tons, maintain an "Oil Record Book" (also known as the "ORB").  All transfers of oil, disposal of sludge and bilge water, and overboard discharges of bilge water that have accumulated in machinery spaces and are thus contaminated with oil, must be fully recorded in the ORB.  33 CFR § 151.25(d).  The captain of the ship must sign every completed page of the ORB.  33 CFR § 151.25(h).  The ORB must be maintained onboard for not less than three years and must be kept on board the vessel readily available for inspection at all reasonable times.

        F.      The regulations authorize the U.S. Coast Guard to board and inspect all vessels in United States ports to determine compliance with federal regulations and the MARPOL Protocol.  14 U.S.C. § 89, 33 CFR § 151.25.  The inspection typically includes an examination of the ORB.  The U.S. Coast Guard relies upon the accuracy of information contained in the ORB to assist in assessing the vessel operator's compliance with all applicable rules and regulations.

        G.      On January 3, 2005, the M/V JOHN G. LEMOS was boarded and inspected by representatives of the United States Coast Guard.  They found a pipe not depicted on the ship's piping diagram which connected the sludge pump typically used to move heavy waste oil connected to the bilge system, and ultimately to the OWS.  The vessel maintained a piping diagram with this pipe drawn in.  Investigators believed this piping enabled the ship to pump oily waste overboard through the OWS. The Coast Guard representatives ordered the crew to perform a test of the OWS.  After the test, the Coast Guard representatives inspected the filters of the OWS and found them to be coated in oil.  The Coast Guard representatives also inspected the pipe

Page 8 -  Plea Agreement – 33 USC § 1908(a)

connecting the OWS to the overboard discharge valve and found oil waste in the piping. Because this piping was outboard of the OWS, the pipe should not have contained any oil under normal circumstances. In initial interviews, crew members denied that oily waste had been discharged overboard. One or more crew members ultimately explained that the sludge pump had been used to discharge waste from the ship's Oily Bilge Tank overboard in excess of the 15 ppm limit. The Oil Record Book did not record the discharge of oily waste overboard from the Oily Bilge tank.

8.      **Non-Prosecution of Other Offenses**:  By this agreement, the United States Attorneys Office for the District of Oregon agrees that it will not undertake to prosecute Pacific & Atlantic for any prior criminal offenses known to the government at the time of signing this agreement, including other potential violations of Title 33, United States Code, Section 1908(a) and Title 33, Code of Federal Regulations, Sections 151.25(a), (d) and (h) offenses arising from the M/V JOHN G. LEMOS' crew members knowing failure to maintain an Oil Record Book in which all disposals of oil residue and all overboard discharges and disposals of bilge water were fully recorded. Pacific & Atlantic understands and agrees that neither this paragraph nor this agreement limits the authority of any  U.S. Attorneys of other judicial districts, or any other federal, state or local regulatory or prosecuting authorities.

9.      **Corporate Authorization**:  Pacific & Atlantic will provide to the United States written evidence in the form of a notarized resolution of the Board of Directors of Pacific & Atlantic with appropriate seals, certifying that defendant is authorized to plead guilty to the felony charges as set forth in the Information and to enter into and comply with all provisions of this agreement. The resolution shall further certify that the President of Pacific & Atlantic and his designees are authorized to take these actions and that all corporate formalities—including, but not limited to, approval by Pacific & Atlantic's directors—required for such authorization have been observed. Pacific & Atlantic agrees that it has authorized Konstantinos G. Gerapetritis to appear

on the behalf of defendant to enter the guilty plea in the District of Oregon and  for imposition of the sentence in the District of Oregon.

10.   **Express Waiver of Right to Appeal Guilty Plea and Sentence**:

Pacific & Atlantic agrees that if the court imposes the sentence recommended by the parties under this agreement, it waives its right to appeal its plea and the sentence, and waives its right to collaterally attack the conviction and sentence.

11.   **Completeness of Agreement**.  The parties agree that this plea agreement is the only agreement between the United States Attorney's Office for the District of Oregon and Pacific & Atlantic concerning this matter.  This plea agreement supersedes all prior understandings, if any, whether written or oral, and cannot be modified other than in a writing that is signed by all parties.  No other promises or inducements have been or will be made to the Defendant by the parties to this agreement in connection with this case, nor have any predictions or threats been made in connection with this plea.

DATED this ____day of January, 2005.

KARIN J. IMMERGUT
United States Attorney
District of Oregon

DWIGHT C. HOLTON
Assistant United States Attorney

1/19/05
Date

Page 10 - Plea Agreement – 33 USC § 1908(a)

PACIFIC & ATLANTIC CORPORATION

By: _____         1/19/2005
KONSTANTINOS G. GERAPETRITIS                    Date
(pursuant to power of attorney
dated January 19, 2005)


APPROVED:

_____              1/19/2005
JANET LEE HOFFMAN                               Date
Attorney for Pacific & Atlantic


_____              1/19/2005
DEAN D. DECHAINE                                Date
Attorney for Pacific & Atlantic

PACIFIC & ATLANTIC CORPORATION
ENVIRONMENTAL MANAGEMENT SYSTEM/COMPLIANCE PROGRAM

EXHIBIT "A"

to

PLEA AGREEMENT

United States v. Pacific & Atlantic Corporation, CR 05-07 (HA)

The following standards and requirements for an ENVIRONMENTAL MANAGEMENT SYSTEM/COMPLIANCE PROGRAM ("EMS/CP") have been prepared pursuant to the Plea Agreement between Pacific & Atlantic Corporation ("P&A") and the United States (hereinafter "Government") filed in the United States District Court for the District of Oregon in United States v. Pacific & Atlantic Corporation, CR 05-07 (HA). Compliance with all of the standards and requirements of the EMS/CP is an essential term of the Plea Agreement and furthermore shall be a condition of probation if so ordered by the Court.

The EMS/CP includes various provisions to ensure that all vessels listed in Attachment 1 hereto[1], which are directly or indirectly owned, operated, managed, manned and/or controlled by P&A comply with all maritime safety and environmental requirements established under applicable international, flag state, and port state law, including, but not limited to, the International Convention for the Safety of Life at Sea ("SOLAS"), the International Safety Management ("ISM") Code, the International Convention for Prevention of Pollution from Ships ("MARPOL"), and all applicable Federal and State statutes and regulations including, but not limited to, the Ports and Waterways Safety Act ("PWSA"), the Act to Prevent Pollution from Ships ("APPS"), the Clean Water Act ("CWA") and the Oil Pollution Act ("OPA").

A.    APPLICABILITY/PURPOSE

(1)    This EMS/CP (or "plan" or "Plan") shall cover and apply to all seagoing vessels owned or managed by P&A as listed in Attachment 1 hereto. Any vessel, the management of which is assumed by P&A and which is scheduled to call on Ports in the United States shall be included within the scope of this plan. Any vessel removed from management by P&A shall be excluded from the scope of this plan. It shall also include all employees of P&A and crewmembers who serve on vessels it manages.

(2)    The EMS/CP is not intended to replace the ISM Code, or any other applicable international legal requirement or United States statute and regulation. The purpose of this EMS/CP is to augment the requirements of existing law by increasing inspections and audits of P&A's vessels listed in Attachment 1 hereto, shore side facilities and operations involving said vessels; increase training of all of P&A's personnel involved with said vessels; develop and implement management and engineering controls to better manage, detect and prevent safety and environmental violations; and require periodic reports to the United States Probation Office for

---

[1] Subject to modification under Section L, below.

-1-

the District of Oregon, the United States Attorney's Office for the District of Oregon, the Environmental Protection Agency, Region 10 and the Coast Guard (hereinafter "the United States") to ensure that P&A is following this EMS/CP and that the vessels listed in Attachment 1, hereto, comply with all maritime safety and environmental requirements established under applicable international, flag state, and port state law and all applicable Federal and state statutes and regulations and that effective management systems are in place to prevent recurrence of violations.

## B.    CORPORATE COMPLIANCE MANAGER

(1)    Within 60 days of entry of the Plea Agreement, P&A shall designate a senior corporate officer as Corporate Compliance Manager (hereinafter "Compliance Manager") who shall report directly to the President and/or Managing Director of P&A.  P&A shall provide the name of the Compliance Manager to the United States.  The Compliance Manager should be the same individual as P&A's "designated person" under the International Safety Management Code (hereinafter "ISM") unless reasons are provided to the United States justifying why the "designated person" should not also be the Compliance Manager.  The Compliance Manager shall be responsible for coordinating with the Independent EMS Consultant, as more fully described below, developing and implementing all of the systems required herein, establishing and implementing training programs for the officers and crew of P&A's vessels listed in Attachment 1, ensuring that audits and surveys are carried out as required and ensuring that all documents are properly maintained and that reports are made on a timely basis to the Independent EMS Consultant and the United States.  All reports required under this EMS/CP shall be reviewed by the Compliance Manager and signed under the penalty of perjury.

(2)    P&A shall establish a procedure that requires all officers, crewmembers and employees, and shore side personnel involved in the management or operation of seagoing vessels of P&A listed in Attachment 1 hereto, to notify the Compliance Manager of any violations of any applicable environmental requirements and to cooperate fully with the Independent EMS Consultant and the United States in carrying out their auditing and oversight functions required by applicable law and this EMS/CP.  P&A agrees to establish a procedure that makes failure to notify the Compliance Manager of any violations of any applicable environmental requirements and failure to cooperate fully with the Classification Societies, the Independent EMS Consultant and the United States in carrying out their auditing and oversight functions required by applicable law and this EMS/CP, grounds for dismissal.  P&A agrees not to retaliate against any officer, crewmember or employee involved in the management or operation of seagoing vessels listed in Attachment I solely for making any such report. Employees or crewmembers may, however, be dismissed for violation of company environmental policies or applicable environmental rules and laws.

## C.    INDEPENDENT EMS CONSULTANT AND INITIAL EMS/CP REVIEW

(1)    Within 30 days following the District Court's imposition of sentence in United States v. Pacific & Atlantic Corporation, CR 05-07 (HA), P&A shall nominate an Independent EMS Consultant who meets the qualifications below to conduct an Initial EMS/CP Review and Evaluation, and a Report of Findings for all P&A's operations as defined below.  The nomination shall be made in writing to the parties identified in Section P below.  The United States will

PDXDOCS:1445735.1

notify P&A in writing of its approval or disapproval within 30 days unless additional time for evaluation is requested in writing. The United States approval shall not be unreasonably withheld.

(2)     Qualified candidates for the Independent EMS Consultant position must have expertise and competence in the regulatory programs under U.S. and international marine safety and environmental laws, and have expertise and competence in waste stream monitoring and control technologies, with a primary emphasis on engine room operations, used by P&A to achieve and maintain compliance in respect to the seagoing vessels listed in Attachment 1, hereto. The Independent EMS Consultant shall also have sufficient expertise and competence to assess whether P&A have an adequate management system in place to assess regulatory compliance, correct non-compliance, and prevent future non-compliance. P&A and the United States acknowledge that the functions of the Independent EMS Consultant may, by mutual agreement, be fulfilled by one or more individuals.

(3)     The Independent EMS Consultant must not directly own any stock in P&A, its subsidiaries, affiliated business entities (owned wholly or partially by P&A) or any agents of P&A, and must have no other direct financial stake in the outcome of duties conducted pursuant to this Plea Agreement. The Independent EMS Consultant must exercise independent judgment. P&A and the Independent EMS Consultant shall disclose to the Government any past or existing contractual relationships between them.

(4)     If the Government determines that the proposed Independent EMS Consultant does not meet the qualifications set forth in the previous paragraphs, or that past or existing relationships with the Independent EMS Consultant would affect the Independent EMS Consultant's ability to exercise the independent judgment and discipline required to conduct the EMS/CP review and evaluation, such Independent EMS Consultant shall be disapproved and another Independent EMS Consultant shall be proposed by P&A within 30 days of P&A's receipt of the disapproval.

(5)     The Independent EMS Consultant shall conduct a review and evaluation of P&A's operations (vessel and shore side) involved in the management and/or operation of seagoing vessels listed in Attachment 1, as such operations relate to waste stream issues, with a primary emphasis on engine room operations. The review and evaluation shall include, but not be limited to pollution control systems, (including use, capabilities and condition of the Oil Water Separators on board P&A's vessels listed in Attachment 1 hereto, and accuracy and completeness of Oil Record Books on board P&A's said vessels) and management systems and compliance programs as they relate to such issues. At the conclusion of the Initial EMS/CP Review and Evaluation, but in no event later than 120 days following imposition of sentence, the Independent EMS Consultant shall prepare a Report of Findings. If the Independent EMS Consultant believes that additional time is needed to analyze available information, or to gather additional information, or to complete the Report of Findings, P&A may request that the Government grant the Independent EMS Consultant such additional time, as required, which request shall not be unreasonably denied. If necessary, the Government may grant additional time in 30-day increments for completion of the Report of Findings. The Report of Findings shall be provided to P&A and the United States. Based on the Report of Findings, P&A shall develop an EMS/CP Manual. (See below)

PDXDOCS:1445735.1

**D.    EMS/CP MANUAL**

(1)    Within three months of receiving the Initial EMS/CP Review and Report of Findings from the EMS Consultant, P&A shall prepare an EMS/CP Manual, which shall describe and document the EMS/CP and contain an EMS/CP implementation schedule for each of the described systems.  For each of the elements described below, the Manual shall describe the EMS/CP in detail, by explaining how the activity or program is or will be (a) established as a formal system or task, and (b) continuously evaluated and improved.  If P&A believes that additional time is needed to analyze available information or to gather additional information to prepare the EMS/CP Manual, P&A may request that the Government grant it such additional time as needed to prepare and submit the EMS/CP Manual, which request shall not be unreasonably denied.  If necessary, the Government may grant additional time in 30-day increments for completion of the EMS/CP Manual.

a)    Environmental Policy

This policy, upon which the EMS/CP is based, must clearly communicate P&A's commitment to achieving compliance with all applicable U.S. and international environmental statutes, regulations, enforceable agreements, and permits (hereafter, "environmental requirements"), minimizing risks to the environment from unplanned waste oil stream releases, and continual improvement in environmental performance. The policy should also state management's intent to provide adequate personnel and other resources for the EMS/CP.

b)    Organization, Personnel, and Oversight of EMS/CP

This section shall describes, organizationally, how the EMS/CP is implemented and maintained and should include organization charts, as appropriate, that identify management and other individuals having environmental performance, risk reduction, and regulatory compliance responsibilities.

This section shall also identify and define  specific duties, roles, responsibilities, and authorities of key environmental program personnel in implementing and sustaining the EMS/CP (e.g., could include position descriptions and performance standards for all relevant staff, and excerpts from others having specific environmental program and regulatory compliance responsibilities).

This section shall describe the ongoing means of communicating environmental issues as they relate to waste stream releases, with a primary emphasis on vessel engine room operations, and information to all organization personnel, contractors, and consultants, and for receiving and addressing their concerns.

PDXDOCS:1445735.1

c)    Accountability and Responsibility

This section shall specify accountability and environmental responsibilities of P&A's managers for environmental protection and risk reduction measures, assuring compliance, required reporting to regulatory agencies, and corrective actions implemented in their area(s) of responsibility.

This section shall further specify accountability and responsibility for P&A's management to adequately supervise the compliance with environmental and safety requirements by P&A's employees and crewmembers, as set forth herein.

This section shall describe incentive programs for P&A's managers and employees to perform in accordance with compliance policies, standards, and procedures.
This section shall also describes potential consequences for departure from specified operating procedures, including employment termination and liability for criminal/civil/administrative penalties imposed as a result of noncompliance.

This section shall make employee and crewmember compliance with environmental policies and applicable international and United States laws a positive factor and failure to comply a negative factor in all evaluations undertaken for the performances of all its employees and crewmembers. Ensures that employees and crewmembers are not punished or otherwise suffer negative consequences solely for reporting violations of environmental laws, regulations, or policies.

This section shall establish a process to ensure that P&A's employees, contractors and consultants accurately report discharges, spills, environmental incidents and other environmental performance data.

d)    Environmental Requirements

The Environmental Requirements portion of the report shall describe the process for identifying, interpreting, and effectively communicating environmental requirements, as set forth herein, to affected company personnel, and ensuring that P&A's activities conform to those requirements (i.e., ongoing compliance monitoring).

This section shall specify procedures for prospectively identifying and obtaining information about changes and proposed changes in environmental requirements, as set forth herein, and incorporating those changes into the EMS/CP (i.e., regulatory "change management").

PDXDOCS:1445735.1

This section shall in addition establish and describes processes to ensure communication with regulatory agencies enforcing environmental requirements and regulatory compliance.

e)    Assessment, Prevention, and Control

This section shall Identify an ongoing process for assessing operations, for the purposes of preventing and controlling or minimizing reasonably foreseeable waste stream releases, ensuring environmental protection, and maintaining compliance with statutory and regulatory requirements, with a primary emphasis on vessel engine room operations. This section shall describe monitoring and measurements, as appropriate, to ensure sustained compliance. It shall also include identifying operations and waste streams where equipment malfunctions and deterioration, operator errors or deliberate malfeasance, and discharges or emissions may be causing, or may lead to: (1) releases of hazardous waste or other pollutants to the environment, (2) a threat to human health or the environment, or (3) violations of environmental requirements.

This section shall describe process for identifying operations and activities where documented standard operating practices (SOPs) are needed to prevent potential violations or unplanned waste stream releases, with a primary emphasis on vessel engine room operations, and defines a uniform process for developing, approving and implementing the SOPs.

This section shall describes a system for conducting and documenting routine, objective, self-inspections by supervisors and trained staff, especially at locations identified by the process described in paragraph D(1)(a) above, to check for malfunctions, deterioration, worker adherence to SOPs, unusual situations, and unauthorized releases.

This section shall also describe the process for ensuring input of environmental requirements, as set forth herein, or concerns regarding potential operator errors or deliberate malfeasance in planning, design, and operation of ongoing, new, and/or changing buildings, processes, equipment, maintenance activities, and products (i.e., operational "change management").

PDXDOCS:1445735.1

f)      Environmental Incident and Noncompliance Investigations

This section shall describe standard procedures and requirements for internal and external reporting of potential violations relating to waste stream release incidents, with a primary emphasis on vessel engine room operations.

This section shall establish procedures for investigation, and prompt and appropriate correction of potential violations by P&A's employees, contractors, and consultants. The investigation process includes root-cause analysis, as appropriate, of identified problems to aid in developing the corrective actions.

This section shall describe a system for development, tracking, and effectiveness verification of corrective and preventative actions taken by P&A's employees and crewmembers.

This section shall describe and implement process for employees and crewmembers to notify P&A's management without fear of reprisal regarding environmental compliance issues and concerns, for example, a phone hot-line.

Each of the described procedures shall specify self-testing of such procedures, where practicable.

g)      Environmental Training, Awareness, and Competence

This section shall identify specific education and training required for P&A's employees and crewmembers, as well as process for documenting, evaluating, and improving training provided. Such education and training are to cover both shore-side and shipboard personnel involved in handling and/or management of waste streams in respect to the oceangoing vessels listed in Attachment 1, hereto.
This section shall describe a program to ensure that P&A's employees and crewmembers are aware of the company's environmental policies and procedures, environmental requirements, and each party's responsibilities within the EMS/CP.

This section shall also describe program for ensuring that personnel responsible for meeting and maintaining compliance with environmental requirements are competent on the basis of appropriate education, training, and/or experience.

PDXDOCS:1445735.1

This section shall also describe the process for tracking company employee and crewmember questions about interpretation of environmental regulations. Such system feedback will provide valuable insight regarding the effectiveness of training and clarity of environmental procedures.

This section shall identify training on how to recognize operations and waste streams where equipment malfunctions and deterioration, operator errors or deliberate malfeasance, and discharges or emissions may be causing, or may lead to: (1) releases of hazardous waste or other pollutants to the environment, (2) a threat to human health or the environment, or (3) violations of environmental requirements.

h)      Environmental Planning and Organizational Decision-Making

This section shall describe how environmental planning, as it relates to activities set forth herein, will be integrated into organizational decision-making, including plans and decisions on capital improvements, product and process design, training programs, and maintenance activities.

This section shall require establishment of written targets, objectives, and action plans for each shore side office and vessel, and how specified actions will be tracked and progress reported. Targets and objectives must include actions that reduce the risk of noncompliance with environmental requirements, as such requirements relate to activities set forth herein, and minimizing the potential for unplanned waste stream releases, with a primary emphasis on vessel engine room operations.

i)      Maintenance of Records and Documentation

This section shall identify the types of records developed in support of the EMS/CP (including self-audits, third-party audits and reports, audit working papers, and correspondence, including e-mails about audits), who maintains them and where and protocols for responding to inquiries and requests for release of information.

This section shall further specify the data management systems for any internal waste tracking, environmental data, and hazardous waste determinations, and specify document control procedures.

j)      Pollution Prevention Program

This section shall describes an internal program for preventing, reducing, recycling, reusing, and minimizing waste releases, with a primary emphasis on vessel engine room operations, including

procedures to encourage material substitutions. Also includes mechanisms for identifying candidate materials to be addressed by program and tracking progress.

k)      Continuing Program Evaluation and Improvement

This section shall describes program for periodic (at least annually) systematic evaluation of the EMS/CP, including incorporating the results of the assessment into program improvements, revisions to the manual, and communicating findings and action plans to affected employees and crewmembers. These evaluations shall include a review of vessel and facility operations and practices related to meeting environmental requirements, as set forth herein. Describes and demonstrates top management commitment to compliance auditing program.  The manual shall describe how the objectivity of P&A's personnel performing the audits or other environmental performance self-assessments will be assured.

This section shall describe and demonstrate the commitment by top management to the compliance auditing program.

This section shall describe how to ensure that adequate resources provided for compliance auditing program and assigns responsibilities for the compliance-auditing program; ensures pre-planning of systematic audits and coordination of audits.

This section shall further describe a process to ensure that the results of audits are reported to P&A's Board of Directors.

(2)      P&A shall submit a proposed final EMS/CP Manual to the Compliance Manager, the EMS Consultant and the United States immediately upon its completion.  The EMS Consultant and the United States shall provide comments on the proposed EMS/CP Manual within 30 days of receipt unless additional time for review is requested in writing. P&A shall submit a supplement to the EMS/CP or a written response, as appropriate, within 30 days of receipt of the comments.  The EMS/CP is subject to final approval from the United States, which approval shall not be unreasonably withheld.  Approval will be deemed to have been made if written notice or objection is not made within 30 days of the submission of any supplement to the EMS/CP.

(3)      All elements of the EMS/CP Manual shall be fully implemented no later than twelve months (12) months following final approval by the United States.  Upon receipt of final approval, P&A shall immediately commence implementation of the EMS/CP in accordance with the schedule contained in the EMS/CP Manual.  The EMS Consultant shall submit reports to the U.S. Attorney and the Probation Office beginning no later than 180 days following selection of

PDXDOCS:1445735.1

the EMS Consultant, regarding the status of the development and implementation of the EMS/CP and the results of the review and evaluation of P&A's operations or audits conducted pursuant to the EMS/CP. These reports shall be made on an annual basis.

## E.    EMS AUDIT

(1)    Within eighteen (18) months from the date on which the EMS/CP Manual is fully implemented, P&A shall arrange for, fund, and complete an independent, third-party focused EMS Audit. The purpose of the focused EMS Audit shall be to evaluate the EMS/CP to insure its continuing suitability, adequacy and effectiveness and to recommend any changes necessary to achieve the objectives of the program. The scope of the focused EMS Audit shall consist solely of a review of shipboard practices, procedures and policies on three of the vessels listed in Attachment 1. The Third-Party Auditor shall choose the three vessels to be audited in consultation with P&A, taking into account, among other things, the vessels' itineraries and availability at a convenient United States port/location. In the event the parties cannot in good faith agree to the vessels to be audited, the Auditor shall make the final selection. If, at the time of the focused EMS Audit, P&A is otherwise in compliance with the existing provisions of the EMS/CP, nothing contained in the report of the Third-Party Auditor shall be deemed to constitute a violation of this EMS/CP, or shall be used by the government as a basis for alleging a violation of probation hereunder. The parties agree that nothing in this section shall be construed to grant immunity for the violation of any applicable statute or regulation.

(2)    The Third-Party Auditor will be certified by the American National Standards Institute-Registration Accreditation Board or will have comparable credentials and experience in performing EMS audits. Selection of the EMS Auditor is subject to the same conditions identified in Section C above regarding selection of the Independent EMS Consultant. Selection of the Third-Party Auditor will be approved by the United States. The United States will notify P&A in writing of its approval or disapproval as expeditiously as possible. The United States approval shall not be unreasonably withheld.

(3)    The initial report of the Third-Party Auditor shall be submitted simultaneously to the United States and P&A, along with the audit working papers and any correspondence related to the audit, including e-mails.

(4)    The final Audit Report shall present the Audit Findings and shall, at a minimum, contain the following information:

a)    Audit scope, including the time period covered by the audit;

b)    The date(s) the on-site portion of the audit was conducted;

c)    Identification of the audit team members;

d)    Identification of the company representatives and regulatory personnel observing the audit;

e)    The distribution list for the EMS/CP Audit Report;

      f)      A summary of the audit process, including any obstacles encountered;

      g)      Detailed Audit Findings, including the basis for each finding and the Area of Concern identified;

      h)      Identification of any Audit Findings corrected or Areas of Concern addressed during the audit, and a description of the corrective measures and when they were implemented;

      i)      Certification by the Independent Third-Party Auditor that the EMS/CP Audit was conducted in accordance with this document and general audit principles.

(5)     Within 30 days from completion of the focused EMS Audit, P&A shall develop and submit to the United States, for review and comment, an Action Plan for expeditiously bringing P&A into full conformance with the EMS/CP Manual. The Action Plan shall include the result of any root cause analysis, specific deliverables, responsibility assignments, and an implementation schedule. P&A may request that the United States permit a brief extension of the time limit stated above on a case by case basis. Such permission shall not be unreasonably withheld.

(6)     The Action Plan shall be reviewed by the designated representative of the United States who shall provide written comments within 30 days of receipt. After making any necessary modifications to the Action Plan based on the comments, P&A shall implement the Action Plan in accordance with the schedules set forth therein. Within 30 days after all items in the Action Plan have been completed, P&A shall submit a written Action Plan Completion Certification to the United States.

## F.   COMPLIANCE AUDITS

(1)     Beginning no later than twelve (12) months following implementation of the EMS/CP Manual, P&A shall arrange for, fund, and complete shore side and shipboard audits of each waste stream at all shore side facilities and on 50 percent (50%) of the Vessels listed in Attachment 1 hereof, with primary emphasis on vessel engine room operations, to verify compliance with applicable laws and regulations. The vessels subject to the focused EMS Audit shall not be included in the compliance audit. Once P&A is required to begin conducting compliance audits, P&A shall conduct such audits on at least 20 percent (20%) of its vessels, listed in Attachment 1, each calendar year. All of the required compliance audits shall be completed before the end of P&A's probationary term. The Independent EMS Consultant will determine which vessels to audit, the location of the audit, and when the vessel will be audited. The Independent EMS Consultant will have full access to P&A's facilities, records, employees and officers at all times. P&A shall immediately advise the Independent EMS Consultant of any issues that come to its attention that adversely impacts P&A's compliance with all applicable laws and regulations and the EMS/CP.

(2)     All audits shall be conducted, as much as is practicable under the circumstances, in accordance with the principles set forth in ISO 9000 and ISO 14011, using ISO 14012 as supplemental guidance. The Independent EMS Consultant shall assess conformance with the

elements specified above and with the EMS/CP Manual. Designated United States representatives may participate in the compliance audits as observers at Government expense. P&A shall make timely notification to the United States regarding audit scheduling in order to make arrangements for observers to be present.

  (3) The Independent EMS Consultant shall deliver each vessel's and facility's audit report to the appropriate company official upon completion. In addition, the Independent EMS Consultant will deliver an Audit Report to the designated representative of the United States within 30 days after the completion of each audit. If the Independent EMS Consultant believes that additional time is needed to analyze available information or to gather additional information, P&A may request that the Government grant the Independent EMS Consultant such additional time as needed to prepare and submit the Audit Report. If necessary, the Government may grant additional time in 30-day increments for completion of the Audit Report. Should the Government or the United States Probation Office seek to revoke P&A's probation based on the Independent EMS Consultant's failure to file a timely Audit Report, P&A shall have the right to contest the reasonableness of such revocation.

  (4) The Audit Report shall present the Audit Findings and shall, at a minimum, contain the following information:

    a) Audit scope, including the time period covered by the audit;

    b) The date(s) the on-site portion of the audit was conducted;

    c) Identification of the audit team members;

    d) Identification of the company representatives and regulatory personnel observing the audit;

    e) The distribution list for the Compliance Audit Report;

    f) A summary of the audit process, including any obstacles encountered;

    g) Detailed Audit Findings, including the basis for each finding and the Area of Concern identified;

    h) Identification of any Audit Findings corrected or Areas of Concern addressed during the audit, and a description of the corrective measures and when they were implemented;

    i) Certification by the Independent EMS Consultant that the Compliance Audit was conducted in accordance with this document and general audit principles.

  (5) Within 60 days from completion of the Compliance Audit or a particular facility or vessel, P&A shall develop and submit to the United States, for review and comment, an Action Plan for expeditiously bringing P&A into full conformance with all applicable laws and regulations and the EMS/CP manual. The Action Plan shall include the result of any root cause

analysis, specific deliverables, responsibility assignments, and an implementation schedule. P&A may request that the United States permit a brief extension of the time limit stated above on a case-by-case basis. Such permission shall not be unreasonably withheld.

(6)    The Action Plan shall be reviewed by the designated representative of the United States who shall provide written comments within 30 days of receipt. After making any necessary modifications to the Action Plan based on the comments, P&A shall implement the Action Plan in accordance with the schedules set forth therein. Within 30 days after all items in the Action Plan have been completed, P&A shall submit a written Action Plan Completion Certification to the United States.

## G.    NON-COMPLIANCE

This EMS/CP does not in any way release P&A from complying with any applicable international conventions and treaties, State or Federal statutes and/or regulations, the ISM Code, or other international maritime safety conventions or treaties and does not limit imposition of any sanctions, penalties, or any other actions, available under those international conventions and treaties, State or Federal statutes and regulations, the ISM Code, or other international maritime safety conventions or treaties. The EMS/CP shall be part of the Plea Agreement and adherence to it will be a condition of probation. Failure to comply with any part of this EMS/CP, (including but not limited to refusal to pay valid charges for the Independent EMS Consultant and failure to provide the Independent EMS Consultant access to vessels, facilities, personnel or documents) shall be a violation of the plea Agreement and shall be grounds for the revocation or modification of Defendant's probation. Should the Government or the United States Probation Office seek to revoke or modify P&A's probation based on P&A's refusal to pay valid charges for the Independent EMS Consultant and/or its failure to provide the Independent EMS Consultant access to vessels, facilities, personnel, or documents, and/or as a result of any disagreement regarding any of the provisions of this EMS/CP, P&A shall have the right to contest the reasonableness of such revocation.

## H.    COMPLIANCE MANAGER/MASTER RESPONSIBILITIES

The Master of any of P&A's vessels listed in Attachment I hereto, with the assistance of the Compliance Manager, shall ensure that timely reports are made to the United States Coast Guard of any non-compliant condition of any of P&A's vessels that calls upon any Port in the United States or sails into any waters under the jurisdiction of the United States. P&A shall establish that enforcement of, and employee compliance with, the EMS/CP, ISM Code, MARPOL, and all applicable State and Federal safety and environmental statutes and regulations is an important positive factor and that failure to comply with such policies, regulations and laws will be a negative factor in all appropriate personnel evaluations.

## I.    BOARD OF DIRECTORS

P&A shall ensure that at least twice yearly, its Boards of Directors receive and review reports from the Compliance Manager and any applicable report from the Independent EMS Consultant concerning the implementation of this EMS/CP including environmental compliance, Safety Management System implementation, and manager, officer, and crew training. Copies of

those portions of the meeting agendas and internal company reports concerning these items shall be included in the reports to the designated representative of the United States and the United States Probation Office for the District of Oregon.

## J.    TRAINING REQUIREMENTS

(1)    Any training requirements implemented in accordance with the EMS/CP Manual discussed above in respect to the vessels listed in Attachment 1, hereto, shall apply to all managers, officers, crewmembers and shore side personnel, as applicable, whether employees or independent contractors, and include applicable Safety Management System implementation and processes, Quality Management Systems, and environmental compliance and reporting requirements required by international, flag state, and port state law, including, but not limited to, and without limitation, SOLAS, the ISM Code, MARPOL (including oil water separators and oil record book requirements and procedures), and all applicable United States statutes and regulations including, but not limited to, and without limitation, PWSA, APPS, and OPA. P&A shall provide and require refresher training on an annual basis commencing immediately. All managers, officers, employees and crewmembers hired after this training is offered shall be trained in these areas prior to reporting to or upon reporting for duty on any of P&A's vessels or otherwise managing or supporting such vessel from shore.

(2)    The Compliance Manager and the Master of each of P&A's vessels listed in Attachment 1 hereto, shall be responsible for ensuring that all officers and crewmembers working on any vessel under its command are trained on the safety, environmental and reporting requirements of applicable international, flag state, and port state law, including, but not limited to, and without limitation, SOLAS, the ISM Code, MARPOL, and all applicable United States statutes and regulations including, but not limited to, and without limitation, PWSA, APPS, and OPA, on at least an annual basis. Each Master taking over any of P&A's vessels shall, within seven days of assuming command of the vessel, ensure that all of the officers and crew under his command have been trained and are in compliance with the above requirement. If any additional training is required, the Master shall ensure that such training is conducted as soon as practicable but in no event more than three days after the Master assumes control of such vessel or whenever there is a change of crew involving six or more crewmembers. In addition, all new crewmembers hired to work on P&A's vessels shall receive training within seven days of beginning to work on board the vessel. P&A shall maintain documentation onboard each of its vessels verifying that all officers and crewmembers working on the vessel have received the required training. Such documentation shall be made available to the Independent EMS Consultant and the United States Coast Guard upon request.

(3)    The Chief Engineer onboard each of Defendant's vessels listed in Attachment I shall prepare independent written verification that all engine room crewmembers have received the training required by this EMS/CP. All engine room crewmembers shall sign and date a statement acknowledging receipt of the training. This written verification, together with the signed acknowledgment, shall be completed semi-annually and maintained in the engine control room of each vessel.

PDXDOCS:1445735.1

## K.    DOCUMENTATION AVAILABLE FOR INSPECTION

The compliance manager shall ensure that all documentation required by this EMS/CP is maintained and available for inspection by the Independent EMS Consultant and the United States Coast Guard.  The Master of each of P&A's vessels listed in Attachment 1 hereto, shall maintain on board the vessel, all records required by international conventions and treaties including SOLAS, the ISM Code, and MARPOL and applicable State and Federal statutes and regulations and any additional documents required under this EMS/CP, such as crew training records, and will make these records available to the Independent EMS Consultant and the United States Coast Guard upon request.

## L.    CHANGES IN OWNERSHIP

P&A agrees that it will immediately (but in no event later than 21 days following a change) notify the United States of any change in name, flag of registry, recognized organization, ownership or class society of such P&A vessels listed in Attachment 1 hereto. P&A shall also forthwith provide to the United States the names of any additional vessels that, during the period of probation, come under the ownership, control or management of P&A which are scheduled to call on Ports in the United States.  Such vessels shall be added to Attachment 1. P&A agrees that this EMS/CP shall remain in effect for all of the aforesaid vessels regardless of changes in the vessels' flag of registry, recognized organizations, name, or class society, so long as the vessels are owned, managed, operated or manned by P&A.  P&A shall notify the United States before any vessel is released from the requirements of the EMS/CP due to a change in ownership, management or manning control, or if such vessels cease calling United States ports.

## M.    SELF-ENFORCEMENT

P&A further agrees that it will undertake and implement the necessary procedures to ensure that this EMS/CP is diligently complied with by the officers and crew of each of P&A's vessels listed in Attachment 1, as well as by all shore side employees, managers and other employees during the period of probation.

## N.    REVISIONS/MODIFICATIONS

The requirements of this EMS/CP, including the dates and time periods mentioned herein, shall be strictly complied with.  Should P&A be unable to comply with any of the deadlines, P&A shall immediately notify the designated representative of the United States in writing of the reason(s) for non-compliance.

## O.    ADDITIONAL RECORD KEEPING REQUIREMENTS

Beginning immediately following sentencing in this case, P&A shall require that engine room crewmembers onboard all vessels listed on Attachment 1 prepare and maintain a Soundings Log.  If practicable under existing circumstances, engine room crewmembers shall be required to sound all waste and bilge tanks and record the soundings in a log book on a daily basis.  Each entry in the Soundings Log shall be initialed by the Chief Engineer verifying that the soundings are accurate.  The Soundings Log shall be maintained in the engine control room and

PDXDOCS:1445735.1

made available to the United States Coast Guard upon boarding the vessel. All Soundings Logs shall be maintained onboard the vessel for a period of three years from the date of the final entry.

**P.    RIGHT TO PETITION DISTRICT COURT FOR AMENDMENTS/CHANGES TO EMS/CP**

The Government and P&A may petition the United States District Court for the District of Oregon to modify the terms of the EMS/CP to ensure the purposes of the agreement are fulfilled and to account for changes in circumstances. In this connection, as set forth in paragraph 5(B)(2) of the Plea Agreement, P&A, at its option, may develop its own EMS/CP Plan within 90 days after the Plea Agreement is entered into and, if acceptable to the Government, will replace this EMS/CP; however, the government retains the sole discretion whether to accept a substitute EMS

**Q.    REPORTS**

All reports, documents and correspondence required under this EMS/CP to be sent to the United States shall be sent to the following offices:

1.    Dwight C. Holton
      Assistant U.S. Attorney
      U.S. Attorneys Office
      1000 SW 3rd Ave, Suite 600
      Portland, OR 97219

2.    U.S. Coast Guard Commandant (G-MOC)
      2100 Second St., S.W.
      Washington, D.C. 20593

3.    U.S. Probation Office
      1000 SW 3rd Avenue, Room 440
      Portland, OR 97204

4.    U.S. Environmental Protection Agency
      1001 SW 5th Avenue, Suite 1510
      Portland, OR 97204

P&A has read this EMS/CP carefully and understands it thoroughly. P&A enters into this EMS/CP knowingly and voluntarily, and therefore agrees to abide by its terms. By the signature below, the corporate representative agrees that it is duly authorized by the corporation's Board of Directors pursuant to the same legal document filed in United States v. Pacific & Atlantic Corporation, CR 05-07 (HA) showing that the defendant company is authorized to enter into and comply with all of the provisions of this Plea Agreement.

DATE:   January *19*, 2005            Pacific & Atlantic Corporation

PDXDOCS:1445735.1

By: _____

As counsel for Pacific & Atlantic Corporation, I have discussed with my corporate client and discussed with its duly authorized representative the terms of this EMS/CP and have explained its requirements.  I have no reason to doubt that my client is knowingly and voluntarily entering into this EMS/CP.

DATE: _____

_____
Dean D. DeChaine

On behalf of the United States, the following agree to the terms of the EMS/CP:

DATE: _____

_____
Dwight C. Holton
Assistant United States Attorney

-17-

**ATTACHMENT 1**

**PACIFIC & ATLANTIC CORPORATION**
**ENVIRONMENTAL MANAGEMENT SYSTEM/COMPLIANCE PROGRAM**

Vessels owned, managed or controlled by Pacific & Atlantic Corporation on effective date of EMS/CP:

1.    AFRICAN OSPREY

2.    ARABELLA

3.    ELIAS L.K

4.    EXPRESS PHAETHON

5.    IMABARI GLORY

6.    JOHN G. LEMOS

7.    JOHN N. PATERAS

8.    KURUSHIMA SEA

9.    MARITSA N.P

10.    OINOUSSIOS